# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5048 | **DATE** | May 27, 2003 |
| **CASE TITLE** | | *Reeves v. Federal Reserve Bank* | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   The Reserve Banks' motion to strike Reeves' statement of additional facts [42-1] is denied and its motion for partial summary judgment [45-1] is granted.  (Enter Memorandum and Order).

(11) ■   [For further detail see order attached to the original minute order.]

| | | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | number of notices | |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | | JUN 12 2003 | 56 |
| | Notified counsel by telephone. | | | | date docketed | |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | | |
| | | | | | date mailed notice | |
| RTS | courtroom deputy's initials | | | | mailing deputy initials | |

CLERK
U.S. DISTRICT COURT
03 JUN 11 AM 10: 23
FILED-ED 10
Date/time received in central Clerk's Office

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MORRIS R. REEVES, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  00 C 5048 |
| | ) |
| FEDERAL RESERVE BANK OF | ) |
| CHICAGO, | ) |
| Defendant. | ) |

**DOCKETED**

JUN 1 2 2003

## MEMORANDUM AND ORDER

Plaintiff Morris Reeves asserts that his former employer, the Federal Reserve Bank of

Chicago, discriminated against him based on his race in violation of Title VII, 42 U.S.C. §

2000e, and 42 U.S.C. § 1981. The Reserve Bank seeks partial summary judgment pursuant to

Fed. R. Civ. P. 56 with respect to Reeves' constructive discharge and pattern and practice claims.

For the following reasons, the Reserve Banks' motion is granted.

**I.      Background**

**A.      The Local Rules**

The court will begin with the Reserve Bank's motion to strike Reeves' response to its

statement of material facts and Reeves' statement of additional facts. The Reserve Bank

correctly points out that Reeves' filings do not consistently cite to specific portions of the record

in support of denials or assertions of fact. Reeves also commingled additional factual assertions

into his responses to the Reserve Bank's facts instead of simply admitting or denying them and

then including the additional facts in his statement of additional facts.

Failure to comply with the local rules governing the form of summary judgment motions

is not a "harmless technicality." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th

Cir.1994). Moreover, the court is not required to scour the record to unearth material factual



disputes or evidentiary support for a party's position. *See, e.g., Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998). Thus, a party who does not properly contest the opposing party's statement of material facts is considered to have admitted those facts to the extent that they are properly supported by the record. Rule 56.1(b)(3); *Midwest Imports, Ltd. V. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995); *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 333 (7th Cir. 1993). Accordingly, to the extent that Reeves failed to provide adequate support for a denial of the Reserve Bank's facts, he will be deemed to have admitted those facts to the extent that they are supported by the record. *See Michas v. Health Cost Controls*, 209 F.3d 687, 689 (7th Cir. 2000).

The court next considers the additional facts raised by Reeves which were commingled with his responses to the Reserve Bank's facts. This practice does not give the Reserve Bank an opportunity to respond to the additional facts and upsets the methodical presentation of facts required by the rules. *See Guzman v. Abbott Labs.*, 59 F. Supp. 2d 747, 758 (N.D. Ill. 1999). Those rules allow the court to determine material facts in an orderly fashion, and the court is entitled to insist on strict compliance. *See, e.g., Waldridge v. Am. Hoechst Corp.*, 24 F.3d at 924. Nevertheless, in the interests of expediency, the court declines to strike the commingled additional facts. Instead, the court will determine if they are properly supported by the record (to the extent that Reeves provided citations to the record) and go from there. *See Guzman v. Abbott Labs.*, 59 F. Supp. 2d at 758. With these caveats, the following facts are derived from the parties' Rule 56.1 submissions and are undisputed unless otherwise noted.

## B. Facts

The Reserve Bank is headquartered in Chicago, Illinois, and maintains a branch in Detroit, Michigan. It also operates satellite offices in DesMoines, Iowa; Indianapolis, Indiana;

and Milwaukee, Wisconsin. At all relevant times the Reserve Bank employed between 2,100 and 2,300 individuals.

### 1. Reeves' Work History with the Reserve Bank

Reeves is an African-American male. In April of 1993, the Reserve Bank hired Reeves for the position of bank examiner in the Chicago office's supervision and regulation department. Alicia Williams, an African-American female, was one of the individuals who interviewed and hired Reeves for his original position.

#### a. The Supervision and Regulation Department

As a newly-hired bank examiner in the supervision and regulation department, Reeves' duties included financial analysis, report writing, and participation in bank examinations. Reeves also created a Home Mortgage Disclosure Act ("HMDA") analysis model. He worked on complex bank examinations but was never the examiner in charge because he did not have a commission.

#### b. The Consumer Affairs Department

After approximately one year of employment, Williams transferred Reeves to the consumer affairs department and promoted him to the position of manager. After the transfer and promotion, Williams was Reeves' immediate supervisor. In 1996, approximately two years after Reeves became a manager in the consumer affairs department, additional functions were transferred to that department, including HMDA.

At that time, Reeves became the HMDA manager. This lateral move gave him some increased responsibilities. He also began reporting directly to Assistant Vice President John Bergstrom, who in turn reported to Williams, who was now a vice president. As the HMDA

3

manager, Reeves oversaw the day-to-day collection of HMDA data and managed administrative assistants.

In 1997, Bergstrom retired and Reeves began to process consumer complaints in addition to his other responsibilities. Reeves acquired a new title – Manager of Consumer Affairs – and once again reported directly to Williams. Reeves also assumed what he described as indirect management over advisory services and consumer education. These functions, however, reported directly to Williams.

At some point during his tenure as Manager of Consumer Affairs, Reeves assumed additional management responsibility for the consumer contact database. Steve Kuehl was primarily responsible for this database. In October of 1999, the consumer affairs department was again reorganized and Williams promoted Kuehl, a commissioned bank examiner, out of his consumer contact database function to fill a new manager position.

As a result Kuehl and Reeves were at the same salary grade level. Kuehl assumed responsibility for three functions Reeves had previously either directly or indirectly supervised: consumer complaints, advisory services, and consumer education. Reeves retained responsibility for HMDA, the administrative assistants, and the consumer contact database function. He also assumed additional responsibility for the division liaison function. Reeves' title was changed back to Manager of HMDA.

Because Kuehl had been promoted out of the consumer contact database position, Reeves was left without a dedicated employee to manage the database. Williams directed Reeves to use existing HMDA staff to replace Kuehl. In addition, Reeves remained in charge of the division liaison function, which also had no dedicated staff. Reeves continued to hold the position of

4

Manager of HMDA, with the above mentioned responsibilities, until he resigned in March of 2000.

## 2. Reeves' Claims of Discrimination

Reeves alleges, among other things, that the Reserve Bank constructively discharged him by: (1) reorganizing in a way that forced him to quit; (2) harassing him; (3) preventing him from taking advantage of training opportunities; and (4) paying him less than other managers and his subordinates. He also asserts that the Reserve Bank engaged in pattern and practice discrimination.

### a. 1999 Reorganization

In June of 1999, Reeves spoke to Williams about how the reorganization would affect his role in the department, including his grade and compensation. He felt that the division of responsibilities between the new Manager of Consumer Complaints and his position (Manager of HMDA) resulted in a dead-end job for him. He thus expressed interest in the Manager of Consumer Complaints position. Williams told Reeves that he could not apply for this position because he was not a commissioned bank examiner. She also told him that she believed a commission was a reasonable requirement for the new manager position because the examination function impacts on the complaint area. The department was reorganized in October of 1999, and Reeves did not get the Manager of Consumer Complaints position he had wanted.

Reeves' loss of supervisory authority over Kuehl and another employee, Ken Davidson, left him with a staff that was 50% secretarial. According to Reeves, the loss of the consumer complaint function resulted in reduced contact with managers at the Board of Governors of the

Federal Reserve System, various directors in the Supervision and Regulation Department, attorneys in the Legal Department, individuals who were developing risk-based bank examination processes, and stakeholders. Reeves believed that consumer complaints was an integral part of the Reserve Bank's examination function. He characterized it as a "core critical" function and thus concluded that management of consumer complaints was a better career track than management of HMDA.

Reeves' grade, salary, and benefits remained unchanged as a result of the 1999 reorganization. As Manager of HMDA, Reeves continued to report directly to Williams and retained the same office. The Manager of Consumer Complaints position that went to Kuehl had the same salary grade as Reeves' Manager of HMDA position.

### b. Alleged Harassment

#### i. 1998 Milwaukee Conference

In 1998, Reeves attended a conference in Milwaukee, Wisconsin, which began at 8:30 a.m. The parties dispute when Reeves arrived and when he was expected to arrive. The record shows that he arrived sometime between 9:00 a.m. and 11:00 a.m. Williams later confronted Reeves and advised him that she had been told that he did not show up for the conference until after 11:00 a.m.

Reeves subsequently asked Deanne Korenchan, one of his co-workers, whether she was the person who had told Williams that he arrived late at the conference. On October 20, 1998, Williams met with Korenchan and Reeves, criticized Reeves for confronting Korenchan, and told Reeves to stop questioning his co-workers about the source of her information. Reeves nevertheless continued to try to ferret out the identity of the informant.

On November 3, 1998, Williams again reprimanded Reeves for doing this. About a week later, Reeves wrote a memo to Williams objecting to the reprimands. However, he never complained to human resources or to Williams' supervisor, Nancy Goodman. According to Reeves, Williams' use of anonymous charges and his co-workers' use of information about his tardiness created a hostile and intolerable working environment.

### ii. Monitoring

Reeves' alleged tardiness was not limited to the morning session of the 1998 Milwaukee conference. Reeves learned that the other employees complained that he arrived late to work and disappeared frequently. Toward the end of his employment, Williams monitored Reeves' activities closely by keeping track of when he came to work, when he left, and how long he took for breaks (including bathroom breaks).

### c. Training and Tuition Reimbursement

In 1998, Williams refused to allow Reeves to attend an HMDA workshop or to attend community contact database training. Williams sent individuals from another group run by a white manager, Sherrie Rhine, to the HMDA workshop. All of these individuals were presenters, unlike Reeves. She also sent Kuehl to the community contact database training. Williams sent Kuehl in lieu of Reeves because at that time, Kuehl was working on the consumer database and Reeves was managing the consumer database.

Williams also denied Reeves tuition reimbursement for his Masters of Jurisprudence. Eventually – and, as Reeves notes, after he filed a complaint with the Equal Employment Opportunity Commission – Williams offered to reimburse him for any courses he could establish were job-related. According to Reeves, because Williams did not specify the criteria for

determining job-relatedness, he could not substantiate his request for reimbursement.

### d.     Pay and Promotion

In January of 1999, Williams allegedly promised Reeves that he would be promoted but ultimately declined to promote him. During his annual review this same month, Reeves told Williams that he felt that his grade and compensation should be increased. In August of 1999, a Reserve Bank EEO Officer told Reeves that Williams did not promote him the prior January because of the August 1998 Milwaukee incident and Reeves' efforts to find out who had provided Williams with information about him.

According to Reeves, on October 6, 1999, Williams again told him that he would be promoted to a higher salary grade if he met her expectations for that month. In late November 1999, however, Williams advised Reeves he would not be promoted.

During his employment with the Reserve Bank, Reeves received a lower salary than some of his white co-workers. At some point, the Reserve Bank performed a salary equity study. As a result of that study, the Reserve Bank determined that Reeves' salary was below the midpoint for his salary grade and gave him a raise to correct the disparity. Nevertheless, Reeves contended that his salary was too low when compared to the salaries of his fellow managers and his subordinates.

### i.     Alleged Salary Discrimination Between Managers

Until September of 1998, Williams' group had three managers: (1) Reeves; (2) Harry Ford, an African-American male; and (3) Sherrie Rhine, a white female. During this time period Rhine was always one salary grade higher than both Reeves and Ford. In September of 1998,

8

Mike Berry, a white male, was promoted to manager at the same salary grade as Rhine (*i.e.*, one grade higher than both Reeves and Ford).

In October of 1999, Kuehl, a white male, was promoted to manager at the same salary grade as Reeves and Ford. Kuehl, however, earned less in actual salary then either Reeves or Ford. In 1998, Rhine received a merit increase which was more than double the percentage of Reeves' merit increase even though Reeves had been performing some of Williams' duties when she was out of the office and some duties that previously belonged to Bergstrom.

### ii. Subordinates Making More than Managers

At certain points in time, both Reeves and Ford had subordinates who were at a higher salary grades or earned a higher salary than they earned. None of Rhine's subordinates ever earned more than she earned. After Kuehl was promoted to manager, another white male, Kenneth Davidson, began reporting to Kuehl. At that time, Davidson earned more than Kuehl. In 2000, when merit and other salary increases were made, Williams raised Kuehl's salary and thus corrected the disparity with Davidson.

In 1999, when Davidson (a white male) still worked for Reeves, Davidson earned more than Reeves. With respect to Ford, two of his subordinates were Harry Pestine (a white male) and Helen Mirza (a white female). Pestine made slightly more than Ford at some points in time until October of 1999. Mirza consistently had a higher salary grade and a higher salary than Ford until October of 1999, when Ford received a promotion and a raise.

### iii. Alleged Racial Discrimination Between Senior Examiners

There were thirteen Senior Examiners in the Community & Consumer Affairs department of the Reserve Bank from 1995 to 2000. Four of those Senior Examiners were

African American (Reeves, Ford, Desiree Hatcher, and Felicia Kline). The remaining Senior Examiners were white (Mirza, Davidson, Pestine, Berry, Kuehl, Deanne Korenchan, Jeff Siegel, Bob Mau, and Jerry Boyle. The court will focus on the salaries of the African American employees compared to the white employees.

### A.     Reeves

Korenchan made more than Reeves from April of 1998 until October of 1999, when Korenchan left the department. Mirza, Davidson, and Berry always made more than Reeves. Mau, Pestine, Boyle, and Kuehl made less than Reeves from 1995 until 2000. Siegel earned less than Reeves after 1996, and Korenchan earned less than Reeves until April of 1998.

### B.     Ford

Siegel made more than Ford until June of 1999. Korenchan, Mirza, and Davidson all made more than Ford until the end of 1999. Mau, Pestine, Boyle, and Kuehl made less than Ford from 1995 to 2000.

### C.     Hatcher

Hatcher was hired in July of 1999. She earned less than Korenchan, Mau, Davidson, Berry, Kuehl, Siegel, Pestine, and Boyle. After November of 2000, however, she earned more than Mau. Williams hired Hatcher and Boyle in close proximity to each other in 1999 for the same position – Senior Examiner. Hatcher was an experienced examiner with a commission who had previously been employed with the Federal Reserve. She had left to work with the Comptroller of the Currency, and was seeking re-employment with the Reserve Bank. Boyle had no experience as an examiner and did not have a commission. Williams hired Hatcher and

Boyle at the same salary grade, but Boyle's actual salary was substantially higher. Moreover, Boyle received a hiring bonus while Hatcher did not.

### D.     Kline

Kline transferred into the department in December of 1999. She earned less than Korenchan, Davidson, Berry, and Kuehl, but more than Mau and Boyle. Kline earned more than Siegel after April of 2000 and more than Pestine after October of 2000.

### e.     Alleged Retaliation

In August of 1999, Reeves filed an internal complaint of discrimination with the Reserve Bank's EEO Officer. In the complaint, Reeves expressed dissatisfaction with, among other things, the proposed reorganization of the consumer affairs department. According to Reeves, Williams retaliated against him for filing this internal complaint by not promoting him to a higher salary grade. Reeves also contends that Nancy Goodman, Williams' supervisor, also retaliated against him by condoning Williams' actions and not independently reviewing the basis of Williams' decision.

For the review period from January 1, 1999, to December 31, 1999, Reserve Bank employees could receive one of five possible ratings on their performance appraisals: outstanding, commendable, effective, needs improvement, or did not meet goals. Commendable was defined as "employee performed beyond expectations in many aspects of his/her job." Effective was defined as "employee solidly met job expectations."

On February 15, 2000, shortly before his resignation in March of 2000, Reeves received a "commendable minus" rating on his 1999 annual performance appraisal. The previous year, in 1998, Reeves received an "effective" rating. Reeves nevertheless asserts that his 1999

11

performance rating was retaliatory and unfair because Reserve Bank managers are discouraged from using minuses and pluses, and the commendable-minus rating does not exist. Reeves also points to his 2% raise at the end of 1999 as unfairly low and retaliatory. Salary increases for 1999 ranged between 0% and 4%.

Ford received a promotion and accompanying pay increase in October of 1999. In 2000, Reeves received a merit increase that was lower than the increase received by Rhine, Berry, Kuehl, or Ford, although in some instances the percentage increases were only slightly different. Rhine and Kuehl also received market increases and Kuehl further received a special increase. Reeves was the only person who had filed a complaint alleging discrimination.

### 3. Reeves' Resignation from the Reserve Bank

After Reeves filed his EEOC charge in September of 1999, he began looking for another job because he believed that filing the charge, in light of the incidents listed above, effectively ended any hope he had of career advancement at the Reserve Bank. However, Reeves was aware of at least one other African-American – his boss, Alicia Williams – who also had filed a charge of race discrimination against the Reserve Bank and who was nevertheless subsequently promoted to Vice President.

Before Reeves resigned from the Reserve Bank, he was offered and accepted a job as an information officer with a Seattle-based company called Backbird Research. His compensation package with his new employer included a base salary, a bonus based on company performance, and stock options if the company went public. Reeves believed that this package had a higher earning potential than his compensation package at the Reserve Bank at the time of his resignation.

### 4. Reeves' Amended EEOC Charge and Complaint

On December 3, 1999, Reeves filed a second charge of discrimination with the EEOC alleging retaliation and age discrimination. In August of 2000, after Reeves had left the Reserve, he filed a complaint in federal court. In his complaint and the amended charge of discrimination filed with the EEOC, Reeves did not allege that the Reserve Bank's allegedly adverse treatment made him feel compelled to resign.

## II. DISCUSSION

### A. Standard on a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.*, 970 F.2d at 365; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a "genuine" material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. The nonmoving party may not merely rest upon the allegations or details in his

pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 322.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears, Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

### B. The Propriety of a Motion for Partial Summary Judgment

According to Reeves, the Reserve Bank's motion for partial summary judgment must be denied because the arguments raised in its motion do not resolve any of his claims in their entirety. The court disagrees. As the Seventh Circuit has noted, partial summary adjudication is "consistent with section (d) of Rule 56, which allows a court to establish facts prior to trial over which there is no 'substantial controversy.'" *ODC Communications Corp. v. Wenruth Invs.*, 826 F.2d 509, 515 (7th Cir. 1987). A partial summary adjudication merely decides one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment on a separate claim. *Id.* Thus, partial summary adjudication is an appropriate mechanism for resolving separate issues prior to trial. *Id.* The Reserve Bank's motion is, therefore, entirely proper.

### C. Constructive Discharge

Reeves filed two EEOC charges, neither of which included a claim of constructive discharge. He also did not raise this issue in his complaint. Generally, a Title VII plaintiff's federal discrimination case is limited to claims that were included in his EEOC charge, *Check v.*

*W. & S. Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir. 1994), or that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.,* 538 F.2d 164, 167 (7th Cir. 1976). This standard is met if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge. *McKenzie v. Ill. Dept. of Transp.,* 92 F.3d 473, 481 (7th Cir. 1996). On the other hand, "[t]he claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint, must, at a minimum, describe the same conduct and implicate the same individuals." *Id.*

Here, Reeves' allegations of constructive discharge are based on and stem from his allegations of race discrimination, which were contained in his original EEOC charge filed in September of 1999. Furthermore, Reeves filed both EEOC charges while he was still employed with the Reserve, so any allegations of constructive discharge would have been premature. *See McKenzie,* 92 F.3d at 482 (recognizing that retaliation claims naturally arise after the filing of the EEOC charge). Thus, Reeves' allegations of constructive discharge are permissible because they are reasonably related to the allegations contained in his EEOC charges.

This would be well and good if Reeves had raised his constructive discharge claims in his complaint. Instead, however, Reeves first alleged that he had been constructively discharged in his deposition which was taken on February 21, 2001. Arguably, Reeves should have sought leave to amend his complaint. *McCann v. Frank B. Hall & Co.,* 109 F.R.D. 363, 367 (N.D. Ill. 1986). However, in the interests of efficiency and because the standards governing amendment are so generous, the court will simply evaluate this claim on the merits.

15

Constructive discharge occurs when an employer subjects a plaintiff to egregious discriminatory harassment that rises above the level of harassment necessary to establish a hostile work environment claim, *Tutman v. WBBM-TV, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000), or when an employer acts in a manner that would make a reasonable employee believe that he will be terminated, *Bragg v. Navistar Int' Transp. Corp.,* 164 F.3d 373, 377 (7th Cir. 1998). To establish constructive discharge, a plaintiff must show that: (1) his employer made the working conditions so intolerable as to force a reasonable person to leave; (2) on account of a protected characteristic. *EEOC v. U. of Chicago Hosps.,* 276 F.3d 326 (7th Cir. 2002); *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 440 (7th Cir. 2000). In support of his claim of constructive discharge Reeves points to five allegedly adverse actions: the Reserve Bank's reorganization, harassment, lack of training and tuition reimbursement, discrimination in pay and promotion, and retaliation based on Reeves' complaint of discrimination.

### 1. The 1999 Reorganization

Reeves asserts that the 1999 reorganization made his working conditions unbearable or intolerable from the standpoint of a reasonable person and made him think he was about to be fired. The record, however, shows that he retained some of his responsibilities and acquired additional responsibilities after the reorganization. Moreover, although his title changed, his new title – like his old title – was managerial and he remained at the same level in the hierarchy of the Reserve Bank. In addition, although two of Reeves' functions had no dedicated employees after the reorganization, Reeves continued to manage the HMDA staff and his grade, salary, and benefits remained unchanged.

16

It is true that Reeves may not have welcomed these changes. Nevertheless, he remained at the same level and retained substantial responsibilities as well as the same salary, grade, and benefits. Thus, he cannot survive the Reserve Bank's motion for summary judgment on his constructive discharge claim based on the reorganization. *See Ulchny v. Merton Community School District,* 249 F.3d 686, 703 (7th Cir. 2001) (a school principal who was closely scrutinized, stripped of all supervisory duties, assigned duties of a $10 per hour aide for a substantial portion of the day, and told she should get another job was not constructively discharged because she retained her former title and pay and continued to perform some duties and responsibilities usually assigned to a principal); *cf. Parrett v. City of Connersville,* 737 F.2d 690, 692-94 (7th Cir. 1984) (a chief of detective was constructively discharged when he was removed from his position, given a windowless room to sit in that was formerly a storage closet, had no telephone, and spent his entire shift sitting with nothing to do).

### 2.    Harassment

Reeves points to two incidences of alleged harassment: (1) Williams' criticism of him due to his tardiness at the Milwaukee conference and her subsequent reprimand of him for speaking with other employees about the matter; and (2) Williams' monitoring of his arrival, departure, and breaks, including bathroom breaks. The Seventh Circuit, however, has held that these types of scenarios are not actionable.

Specifically, a reprimand for tardiness or a restriction on communication with co-workers are not enough to state a claim for constructive discharge. For example, in *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 705 (7th Cir. 1993), the plaintiff alleged she was reprimanded for no reason, excluded from office activities, given a less lucrative sales territory, given no new

17

accounts, and stripped of supervisory duties. The Seventh Circuit found that these actions were not intolerable. *Id.* at 705. Similarly, in *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 735 (7th Cir. 2001), the Seventh Circuit rejected a constructive discharge claim when the employee was falsely accused by other employees, not given sales leads like other employees, and forced to do more stock work than other employees. *Johnson,* 260 F.3d at 735.

Close monitoring of an employee also does not amount to constructive discharge. *See id.* (rejecting constructive discharge claim when the plaintiff was monitored to determine whether she was stealing); *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir. 1996) (rejecting constructive discharge claim where the plaintiff was subjected to workplace restrictions including orders to only talk to coworkers about business matters, report before leaving work and upon returning, limit breaks to twenty minutes, and not use the secretary for typing). Here, Reeves may have been personally distressed by the reprimands and monitoring. However, reprimands for tardiness, restrictions on communication with co-workers, and monitoring do not raise a triable issue of fact as to whether he was constructively discharged. Accordingly, after careful consideration of the evidence, the court finds that the Reserve Bank's alleged harassment did not make the working conditions so intolerable as to force a reasonable person to leave.

### 3.    Training and Tuition Reimbursement

Reeves next asserts that the Reserve Bank's denial of training or tuition reimbursement created an intolerable working condition and made him think that he was about to be terminated. The court disagrees. A materially adverse change in the terms and conditions of employment must rise above the level of a mere inconvenience or an alteration of job responsibilities. *See, e.g., Traylor v. Brown,* 295 F.3d 783, 788 (7th Cir. 2002). Examples of a materially adverse

change include a termination of employment, a demotion evidenced by a decrease in pay, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. *Id.*

In contrast, an employer's denial of educational and training opportunities does not create a materially adverse change in the terms and conditions of employment. *Spencer v. AT&T Network Sys.*, No. 94 C 7788, 1998 WL 397843 *5 (N.D. Ill. July 13, 1998). It is true that a lack of training might potentially someday affect an employee's performance. However, a hypothetical future performance issue is not enough to state a claim for a materially adverse change in the terms and conditions of employment.. *See id.* Thus, Reeves' constructive discharge claim based on the lack of training and tuition reimbursement must fail.

### 4. Pay and Promotion

Reeves also argues that the Reserve Bank constructively discharged him when it passed him over for a promotion twice and paid him less than other managers, senior examiners, and subordinates. Being passed over for a promotion, however, does not constitute constructive discharge unless the employer follows an "up or out" type of policy. *See Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998) ("[a] reasonable employee would not have considered a failure to be promoted an event that made her working conditions intolerable" where failure to promote was not a de facto termination of employment); *Rabinovitz*, 89 F.3d at 484, 489 (two denials of a promotion did not rise to the level of constructive discharge where an employer did not have an "up or out" policy). The record does not indicate that the Reserve Bank had such a policy. Thus, the decision not to promote Reeves is not actionable.

Similarly, earning less than other employees with the same title or less than some employees within the same salary grade is not actionable. *See generally, Wolf v. N.W. Ind. Symphony Soc'y,* 250 F.3d 1136, 1143 (7th 2001). This is especially true where the disgruntled employee makes more than others within those same groups. *Id.* Here, Reeves was neither the top wage earner for his title and grade nor the lowest. Thus, the fact that he earned less than some of the other managers and senior examiners is not enough to enable him to survive the Reserve Bank's summary judgment motion. *See id.*

This leaves the court with the fact that Reeves earned less than a subordinate (Davidson) in 1999. First and foremost, the record does not establish when Reeves discovered this pay disparity. If he found out about it when conducting discovery for this lawsuit, Davidson's salary could not have created an intolerable working condition because Reeves would not have known about it while he was still employed at the Reserve Bank. *See generally Mason v. Southern Ill Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir. 2000) (if an employee is unaware of a statement while she is employed, the statement cannot create a hostile work environment for that employee). In any event, after the 1999 reorganization, Reeves was no longer Davidson's manager. Moreover, when Reeves resigned from the Reserve Bank, he earned more than his subordinates. In addition, Reeves was not alone in earning less than his subordinates for a period of time, as both Ford and Kuehl had subordinates who made more than them at one point in time, and both were eventually given salary raises that corrected the disparity. In light of these facts, the court finds that a reasonable person who was earning more than his subordinates at the time of his resignation and who had, along with his peers, earned less than a subordinate

for a short period of time did not suffer a materially adverse action. Thus, Reeves' constructive discharge claim based on his salary must fail.

## 5. Retaliation

Next, Reeves recasts his claims arising out of the reorganization, alleged harassment, failure to provide training, and his salary as retaliation for filing a complaint with the Reserve Bank's EEO Officer. To state a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action. *See, e.g., Rabinovitz*, 89 F.3d at 488. For the reasons discussed above, the actions that Reeves claims were retaliatory did not rise to the level of an actionable adverse employment action. Accordingly, Reeves cannot survive summary judgment as to his individual retaliation claims.

Reeves also alternatively contends that the totality of the circumstances created an intolerable, retaliatory working environment. The court disagrees. The specific incidents listed by Reeves do not, even in their totality, suggest that Reeves' working environment was so intolerable that a reasonable person would have no choice but to resign. The tardiness incident, at most, suggests that there was friction between Reeves and Williams. *See id.* at 489. Reeves' remaining complaints about the Reserve Bank establish that he was dissatisfied with his job, not that the Reserve Bank was creating an intolerable working environment based on his race. *See Rabinovitz*, 89 F.3d at 489-90 ("[e]ven taken together, . . . a lowered performance rating, workplace restrictions and monitoring, refusal of flex time, alleged retaliation, and derogatory statements" did not create an intolerable environment); *cf. University of Chicago Hospitals*, 276 F.3d at 332 (employee was constructively discharged where her employer told her that she

21

would be terminated if she did not resign and when the employee returned from vacation, her belongings were packed and her office was being used for storage).

### D.     Pattern and Practice

Reeves also argues that the Reserve Bank engaged in a pattern and practice of discriminating against African-American employees. To state a prima facie case for a pattern and practice discrimination claim, a plaintiff must point to more than mere isolated incidents of discrimination. *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876 (1984). Specifically, the plaintiff must show "that racial discrimination was the company's standard operating procedure – the regular rather than the unusual practice." *Id.* A plaintiff can meet this burden by establishing that gross statistical disparities between similarly situated employees of different races exist. *See Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 307-08 (1977); *Bell v. Envtl. Prot. Agency,* 232 F.3d 546, 533 (7th Cir. 2000) (statistical evidence is the heart of a plaintiff's prima facie pattern and practice disparate treatment case). Anecdotal evidence can also supplement statistical support for a pattern and practice discrimination claim. *See Int'l Bhd. Of Teamsters,* 431 U.S. at 336; *see also Mozee v. Am. Commercial Marin Serv. Co.,* 940 F.2d 1036, 1051 (7th Cir. 1991) (pattern and practice claims are often based on "a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally").

Here, Reeves offers no statistical evidence. This leaves him with a claim that the Reserve Bank had a pattern and practice of discriminating against African-American employees (more specifically, himself and between three and six other African-American employees, depending on which pleading the court looks at). The court begins by noting that Williams, one

22

of the allegedly mistreated employees, was Reeves' supervisor and appears to have enjoyed a successful career at the Reserve Bank. Thus, it is unclear how anecdotal evidence relating to Williams could support a discrimination claim as to Reeves, and it is even more unclear what that anecdotal evidence might be. It is, of course, Reeves' burden to point to specific evidence to withstand summary judgment, and he has failed to carry this burden as to Williams.

In any event, anecdotal evidence relating to a few employees in one department of one of an employer's locations is not enough to state a pattern and practice claim where an employer employs over 2,000 employees in numerous locations with numerous departments. *See Guerrero v. Ashcroft*, 253 F.3d 309, 315 (7th Cir. 2001) (two allegations of discrimination by the FBI, even combined with some statistical evidence, was not enough to establish a pattern and practice claim); *O'Keefe v. Varian Assoc., Inc.*, No. 95 C 4281, 1998 WL 417498 *9, n.11 (N.D. Ill. July 23, 1998) (that three allegations of discrimination, each brought by different individuals, do not establish a pattern and practice of discrimination). Reeves' general contentions about a few employees' salaries at a few points in time is simply not enough to establish the existence of a triable pattern and practice claim. Thus, the Reserve Bank is entitled to summary judgment on Reeves' pattern and practice claim.

### E.    Section 1981 Allegations

Reeves also appears to be seeking relief under 42 U.S.C. § 1981. Title VII standards govern § 1981 discrimination claims. *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996). Because the Title VII claims discussed above fail, Reeves' § 1981 claims also must fail.

## III.   CONCLUSION

For the foregoing reasons, the Reserve Banks' motion to strike Reeves' statement of additional facts [42-1] is denied and its motion for partial summary judgment [45-1] is granted.

DATE:

*Blanche M. Manning*

Blanche M. Manning
U.S. District Court Judge

00cv5048.sj

24